## MAULDEN, MONTAGUE & CO. *vs.* ARMISTEAD, Ex'r, et al.

1. Where the contract in respect to a chattel passes neither the legal nor equitable title, a court of equity will not enforce its specific execution against a subsequent assignee of the legal title, although he has acquired it with notice.

Maulden, Montague & Co. v. Armistead, Ex'r, et al.

2. A. conveyed to S. certain real and personal property, together with his then growing cotton crop, on the trust, that if the proceeds of the property, other than the crop, should prove insufficient to satisfy certain debts due by him to C., "then whatever may remain due thereon shall be paid by the trustee (S.) out of the crop &c., and that out of the same crop he shall pay to M., M. & Co. a bill for two thou. sand dollars, drawn by A. on said M., M. & Co., and by them accepted on the faith of the crop &c., and also pay to the same firm the amount due by the said A. on his account current," &c. The deed then provides, after the discharge of "the debts already directed to be paid out of the sales of the crop," &c., for the payment of other creditors in the order in which they are named: *Held*—That there is nothing in the deed to show that A. intended to create a preference, as between C. and M., M. & Co., so far as the proceeds of the cotton are concerned, and those proceeds not being sufficient to discharge the balance due to C., after the other property conveyed had been exhausted, and the debts due to M , M. & Co., they should be ratably distributed between them.

3. Where the injunction of an entire judgment at law has in the first instance been properly granted, and the answer shows that the complainant is entitled to some relief, though not to the extent claimed by the bill, the injunction may be dissolved in part, or continued on such terms as will ensure ultimate justice between the parties; but to authorise such dissolution, or a requirement that the complainant pay a portion of the judgment into court as a condition to the continuance of the injunction, the answer should show explicitly the amount which the plaintiff at law is in equity entitled to receive. If this be not done, and there is no danger of the debt being lost by continuing the injunction, it should be retained until the final hearing.

ERROR to the Chancery Court of Marengo. Tried before the Hon. J. W. Lesesne.

THIS bill was filed by the plaintiffs against the defendants in error, one of whom is William Armistead, the executor of James Semple, deceased. It alleges that on the 25th of February 1842, Robert B. Armistead was indebted to the complainants by account, in the sum of $1900, and that on that day, they accepted, for the accommodation of the said Robert B., his draft on them for $2000, payable one hundred and twenty-five days after date, upon the express promise and hypotheca-tion by him of his crop of cotton to be raised that year, as a means both of indemnifying them against loss by reason of such acceptance and of paying them the amount which he then owed them; that on the 30th July 1839, the said Robert B.

made a deed of trust to George W. Semple and James L. Price, by which he conveyed to them his plantation and about forty slaves for the purpose of securing the payment of debts due by him to Hugh Campbell, of Virginia, for which William Armistead and James Semple were liable as his securities, with power of sale whenever judgment should be recovered against said securities; and that on the 17th March 1842, the said Robert B. executed another deed of trust to James Semple, by which he conveyed to him a house and lot in Greensboro', several slaves, all his horses, mules, cattle, corn, provisions, plantation utensils, furniture, and the crops growing or to grow during that year on his plantation, &c.—also the plantation and slaves conveyed by the deed of the 30th July 1839. This deed is made an exhibit to and a part of the bill, and contains the following stipulation : "that if the proceeds of the sales of the property above mentioned as conveyed to secure the debts due to Hugh Campbell, should prove insufficient to satisfy the debts, then whatever may remain due thereon shall be paid by the trustee (Jas. Semple) out of the crop to be raised the present year on the plantation conveyed to secure those debts, or out of any property hereby conveyed, and that out of the same crop, he shall pay to Maulden, Montague & Co. a bill for two thousand dollars, drawn by Robert B. Armistead on said Maulden, Montague & Co., and by them accepted on the faith of the crop of cotton to be raised the present year, believed to be dated the 25th Feb. 1842, and payable one hundred and twenty-five days after date, and also pay to the same firm the amount due by the said Robert B. on his account current—say $1900 or $2000; and further, that having discharged the debts already directed to be paid out of the sales of the crop to be grown and any property hereby conveyed, the said trustee shall sell, according to his discretion as to the time and manner of sale, as much of the property conveyed as may be necessary to pay the following debts," &c. in the order named in the deed. The bill also alleges that one hundred and fifty-five bales of the cotton raised on the plantation in 1842, were shipped to them by the said James Semple and sold by them for the sum of $3,878 13, which sum they applied to the payment of the said acceptance and the account due to them by the said Robert B.; that the property conveyed by the first deed had been sold by the

trustee for between $19,000 and $20,000, and all that embraced by the other deed, except the cotton, for $5631, and that those amounts, together with payments made by Robert B. Armistead, had fully discharged the debts due to the said Hugh Campbell; and that notwithstanding this, and the hypothecation of the crop to the complainants to indemnify them, &c., the executor of the said Semple had sued and obtained a judgment against them for the proceeds of the cotton crop and his executor was about to enforce the same. The bill further alleges that it was the intention of Robert B. Armistead, by the deed of the 17th March 1842, to give them priority of payment out of the proceeds of the cotton crop, and if the deed does not do so, it has occurred by mistake, and the deed should be reformed, &c.

There are other matters stated in the bill, but they are not necessary to an understanding of the opinion. The prayer of the bill is for an injunction, a specific performance of the parol contract with Robert B. Armistead, and general relief.

The answers of the defendants admit the indebtedness of Robert B. Armistead to the complainants as alleged, and the execution of the deeds—also the sale of all the property except the cotton, by the trustee, but insist that after the application of the proceeds to the payment of the debts of Hugh Campbell, a balance still remains due of about $5000. They deny that the cotton crop was hypothecated as alleged, or that the deed of the 17th March 1842, did in fact or was intended to give the complainants priority of payment out of the proceeds of the cotton, but on the contrary, insist that the residue of the debt due to Campbell, after exhausting the other property, was to be paid out of those proceeds before the complainants were entitled to any thing. An injunction having been previously granted, the defendants, on the coming in of their answers, moved to dissolve the injunction, which motion was sustained by the chancellor and the injunction accordingly dissolved. From the order of dissolution, the complainants appealed, and they now assign it as error.

MANNING and BROOKS, for the plaintiffs in error:

1. "The object of the bill, (says the chancellor,) according to its prayer, is, first, especially to execute the alleged parol contract, by which the complainants charge that the crop of cotton

was hypothecated to them, and secondly, if necessary to that end, that the trust-deed of the 17th of March 1842, be reformed and corrected so as to carry out said contract, and the purpose, intention, intention and understanding of Robert B. Armistead (the grantor,) when he made the same, *i. e.* the deed." " It certainly (proceeds the chancellor,) can require neither argument nor authority to show that we are not at liberty to look ouside of the deed, or to any prior parol contract, not made a part of it by express reference, in order to ascertain the meaning of the deed and the intention of the parties." We think " it can require neither argument nor authority," to maintain the exact reverse of this doctrine. What need would there be to reform the deed at all, if "the intention of the parties" were already expressed in it? And how is that intention to be carried out, and the fraud of the writer prevented, or his mistake corrected, (one or the other of which is charged in this bill, as well as a knowledge by the defendants of the prior hypothecation,) unless we can go out of the deed to prove the intention which is not expressed in it?

2. To the argument that whether complainants are the first prefered creditors by the deed, or are entitled to only a *pro rata* share of the trust fund, still they have a right to a continuance of the injunction, the answer not disclosing what amount of the money in controversy, the respondent is entitled to, the chancellor says, there are three "conclusive answers:"

1. "It is an attempt to play fast and loose at the same time; to blow hot and cold with the same breath," &c.

Is it a new idea in equity courts, or a thing of infrequent occurrence, to grant to a plaintiff, upon his general prayer " such further, or other relief," as may suit his case, less than he thinks he is entitled to? If we err in the opinion that complainants are the first prefered creditors, or were intended so to be, can the court not protect them from being compelled to pay over so much as they really have a right to retain?

2. The chancellor says, it is the duty of the complainants to show to what extent they are entitled to the continued interposition of the court. They have done all they can to show this, by being exact and precise in all their statements of dates and amounts, so far as they are concerned. The only difficulty in this point of view arises from the want of precision in the answer about matters within respondent's own knowledge.—See

as an authority on this point, Rembert et al. v. Brown, 17 Ala. Rep. 667.

The 3d reply of the chancellor is, that the bill contains no offer to pay to defendant what may be due to him. Such an offer is necessary only when the bill admits an indebtedness. Here an indebtedness to any extent is denied.—Nelson & Hatch v. Dunn, 15 Ala. 501. Besides, this is in effect a bill for an account, and in such a case, an offer to pay is not necessary.— Nelson & Hatch v. Dunn, *supra*. Moreover, if the omission of such offer were a defect, leave to amend, by inserting it, ought to have been granted before a dissolution of the injunction.— Calhoun, by next friend, v. Cozzens, et al., 3 Ala. 498.

3. True, the respondent, in the most positive manner, denies that there was any hypothecation, or promise, made of the cotton crop, to Mauldin, Montague & Co. when they accepted for Robt. B. Armistead his draft for two thousand dollars, although they in their bill, and he in the letter, of which they make an exhibit, say there was. But then, the respondent also says, that M., M. & Co. accepted the draft for said Robert in the city of Mobile, when he was on his way back from Texas, and while respondent was in Greene county, (about 150 miles off,) and he does not pretend that he had any information from any person, on the point. Positive, therefore, as is his denial of a transaction, of which he could not have any knowledge, the court can give it no more credit or weight than a declaration of his belief on the subject, and a denial upon even information and belief, against the averments upon knowledge of the bill, does not authorise a dissolution of the injunction.—Calhoun v. Cozzens, et al., *supra*. Nor can any allegations of the answer that are not responsive to the bill be regarded upon this motion.—Rembert et al. v. Brown, 17 Ala. 667. And if they could be, as respondent does not seek to reform the deed, but claims under it as it stands, nothing that he as a defendant has said, or could say and prove, would effect the interpretation of the deed.

4. What now is the meaning of the deed, and the rights of the parties under it, as it stands, and without being reformed? We say, first, the Campbell debt is not entitled to priority of payment, over the amount due to M., M. & Co., for although the former is the debt first mentioned, there is no direction to the trustree to pay that first, but almost a direct instruction not

to do so. Because, after mentioning and providing for both the balance that may be due to Campbell when he shall have received the proceeds of the trust-deed of July 1839, and the amount due to M., M. & Co. upon their acceptance and account current, the deed proceeds to declare, "that having discharged the debts already directed to be paid out of the sales of the crop to be grown, and any property (thereby) conveyed," the trustee shall pay the debts subsequently mentioned, beginning with the next, which was due to one Zarah Stubbs, "in the order in which they are enumerated, and giving priority to them according to that order." What can be more clear than the precedent debts were not to be paid in that order, and, therefore, that the balance due to Campbell was not to be first paid?

To the argument of the solicitors for the defendants, that because the plantation and most of the slaves by which the cotton crop was afterwards chiefly made, had been conveyed by the deed of 1839, to secure payment of the debt to Campbell, therefore the crop should be appropriated in the same way, it is sufficient to reply that the deed of 1839 gave no right of possession to the trustee except upon a future contingency, and did not convey this crop, and we do not understand how the fortunate creditor, who has already one security, is, therefore, entitled to another as against other creditors less favored.

Secondly—is, then, the balance due to Campbell, and the amount due to M., M. & Co. to be paid *pari passu?* In relation to a part of this amount, we admit they are. But the amount of M., M. & Co's. acceptance for two thousand dollars is entitled to priority of payment out of the cotton money. For, in relation to this amount and when it is first mentioned, the deed not only designates the crop of cotton, as the particular source from which it is to be paid, (failing which, it was to be discharged out of any of the property conveyed,) but mentions also that the draft "was by them accepted on the faith of the crop of cotton." Effect must, if possible, be given to every word used in an instrument solemnly made. For what purpose, (the law presumes there was some,) could the language last quoted have been used, in the connection in which we find it, but as a recognition by the grantor, and notice to the trustee and beneficiaries, of M., M. & Co's. prior right, (whether it were created as they say, by express hypothecation or otherwise,) to be paid the amount re-

fered to out of the proceeds of the cotton? If this is not the meaning of the clause, it is useless for any good purpose, and operative only to show that while the grantor recognised this prior right, he and the others concerned in concocting the deed had defeated it, by requiring a part of the money which should have gone to M., M. & Co. to be paid upon the debt to Campbell; a fraud which could have been perpetrated as well without, as with the open acknowledgement of it upon the records of the country. But the law will not impute, nor do we, such shameless want of good faith; on the contrary, we say this phraseology was used for the purpose of recognising and giving effect, if necessary, to the prior obligation of the grantor, and the reason why this was not more explicitly done, was because he probably thought at the time that the trust-fund was sufficient to pay both debts. Observe, it is not necessary for us to show, as against these defendants, who claim only under and according to the deed, that M., M. & Co's. interest in the cotton, at the time of the acceptance, was so perfect a legal right, that they could afterwards take and hold the cotton by legal proceedings, even as against Robert B. Armistead. The deed is, in one sense, a voluntary instrument, not made up on any new consideration, and the grantor's will, as collected from it, is the law to those who claim under the deed as it stands. We say then, that even if the original right of M., M. & Co. were imperfect, yet it became fixed and perfect by the deed. For when, in the first place, after directing the amount of the draft to be paid out of the proceeds of the cotton, the grantor adds that it was accepted by the complainants on the faith of that crop, he in effect admits that it was done only upon such a reliance, induced by him, upon the cotton crop as the specific source from which they were to be indemnified, as that it would be a want of good faith to disappoint them. And this, when incorporated in the deed, is a sufficient notice to the trustee of their right, and a direction to respect it accordingly.

MURPHY and SEMPLE, for the defendants:

1. The injunction was properly dissolved, as was intimated by the court, if nothing was due M., M. & Co., by the construction of the deed of 1842.

2. Suppose that by the construction of the deed of 1842, it

shall appear that as to a part of their demands, M., M. & Co. were placed on the same or an equal footing with Campbell— then the injunction was properly dissolved, because it would appear that something was due on the judgment; that it must have been known that something was due on it by complainant at the time of filing his bill; that no efforts have been made by complainant to ascertain how much, and that he had the means of ascertaining it, if he had chosen to do so.  He offers nothing in his bill, although he speaks of a previous offer to compromise, and thus fails to prepare himself to enter with clean hands and a clear conscience into a court of equity.  He who seeks equity, must do equity.

3. It will not do to say, in answer to the above, that the bill expressly denies that any thing is due, and therefore it would be absurd to offer to pay any thing.  The complainant takes the responsibility of construing the deed, and his failure to construe it correctly will not help him.  If doubtful, he should have submitted it to the court, and accompanied by an offer to pay, which might have aided him.

4. Even supposing the complainants to be entitled in equity, under the terms of the deed of 1842, to retain the whole of their demands, or claims, yet the injunction should have been dissolved; for on the bill and answer it does not appear that their claims amount to more than $3,900, while as to this amount, the answer denies a portion of the indebtedness, to the extent of $750, which must have been upon the knowledge of the respondent, for he afterwards alleges that he paid it himself.  This would reduce the claims or demands of M., M. & Co. under the deed, to $3,150, and thus the bill and answer show a clear balance in the hands of the complainants to which they have no possible claim, of the difference between $3,150, and amount of sales $3,850, say $700, with interest for seven or eight years, due on a judgment at law, and enjoined, without an offer to pay it.

5. As to the construction of the deed of 1842, it is clear that the most favorable construction which can be given it for complainant, would only place the bill of exchange on the same footing, as to the proceeds of the cotton crop, as the remainder of Campbell's debts, after the application of the proceeds of the deed of 1839, and the other property conveyed in the deed of 1842; for the terms of the deed direct the payment of Camp-

Maulden, Montague & Co. v. Armistead, Ex'r, et al.

bell's debt out of the proceeds of all the property, cotton crop included, and the payment of M., M. & Co.'s bill out of the "same crop" alone, and no particular fund is designated for the account current of $1,900, which would strongly imply that the $1,900 is postponed to Campbell's debt, as well as the bill; the account current being thus only prefered to the class commencing with Zarah Stubbs.

6. If the terms of the deed would, irrespective of the recital, "accepted on the faith, &c.," give an equal interest in the cotton crop in proportion to the amount of the remainder of the debts of Campbell, after applying the other property to them, and the amount of the bill of exchange to Campbell's debts, and M., M. & Co.'s bill of exchange, then the recitals should not be permitted to control this construction; for the inducement to secure Campbell's debt on the cotton crop is also recited, the previous conveyance of the subject matter out of which the cotton is to issue, (the lands and slaves,) to secure Campbell's debt, and is quite as strong and equitable as the inducement to secure the bill on the cotton crop.

7. The deed does by its terms plainly prefer Campbell's debts to M., M. & Co.'s, not only as to the account current, but as to the bill of exchange.

8. The view taken in the sixth point does give effect to the words recited—" on the faith, &c."—and the views of the seventh point are not inconsistent with an effect to them for the preference to the bill of exchange over the account current, and the Zarah Stubbs class would be a sufficient effect.

An objection was made to the answer, as to the amount remaining due on Campbell's debts—"about five thousand dollars." This objection can only be made properly by way of exception, and the answer having been received without exception, for this uncertainty, it is accepted, as sufficiently certain.

DARGAN, C. J.—We will first examine the right of the complainants to retain the proceeds of the crop of cotton raised by Robert B. Armistead in the year 1842, in opposition to the deed executed by him to James Semple on the 17th day of March, 1842; and then we will endeavor to ascertain their rights under that deed. If we can come to correct conclusions on these questions, we then can see whether the chancellor erred in dissolving the injunction.

That the deed executed by Robert B. Armistead, on the 17th day of March 1842, was valid and conveyed to him the legal title to the cotton, is not an open question; it was so decided in the case of Maulden, Montague & Co. v. Armistead, 14 Ala. 702. But the bill alleges that Robert B. Armistead was indebted to the complainants in the sum of nineteen hundred dollars, and that in consideration that the complainants would accept his bill for two thousand dollars, payable to William Armistead, and due at one hundred and twenty-five days from date, he on the 25th day of February 1842, promised and hypothecated to the complainants his crop of cotton, to be grown that year, and to send it to them, when gathered and prepared for market, for sale and for the payment and reimbursement to them both of the amount of said nineteen hundred dollars and the amount of said bill, together with the usual commissions for accepting and paying the same. Does this contract give to the complainants an equitable right to the cotton, made by Robert B. Armistead in the year 1842, that a court of equity will enforce against the legal title? I am clearly of the opinion that it does not. The only ground upon which the complainants could contend that their title should be prefered in equity, is that Semple, having notice of the contract between Robert B. Armistead and themselves in reference to the cotton, at the time the deed was executed, a court of equity ought specifically to enforce it. But the general rule is not to enforce the specific execution of a contract respecting goods or chattels. Indeed it will never be done, where compensation in damages for a breach of the contract would furnish a complete remedy.—2 Story Eq. § 718. There may be cases found where a court of equity will decree a specific performance of a contract in relation to personal property, where the remedy at law would prove unavailing or incomplete. See Clack v. Flint et al., 22 Pick. 231. But I apprehend that such contracts only will be enforced, as convey a specific legal or equitable title to the chattel in favor of the party seeking to enforce it. If the contract gives no legal or equitable title to the goods, a court of equity cannot decree a specific execution of it against an assignee, even with notice. Now at the time of entering into this contract, the cotton was not *in esse*, nor did the contract give to the complainants any interest in the land upon which the cotton was grown, nor in the slaves by whose

labor it was cultivated. They then took no title to the cotton, nor any lien upon it. They could only acquire a title, by the terms of their contract, after the cotton was gathered and shipped to them, consequently, the legal title to the cotton, acquired by Semple under the deed of the 17th of March 1842, cannot be defeated by the contract set forth in the bill, nor can the complainants claim any interest in the proceeds of the cotton in opposition to this deed.

2. We next must ascertain what interest the complainants take in the cotton under or by virtue of the deed. It appears that Robert B. Armistead, being largely indebted to Hugh Campbell, of Virginia, upon which William Armistead and James Semple were securities, for the purpose of securing this debt and protecting his securities, on the 30th day of July 1839, executed a deed of his land and a large number of slaves, conveying them to trustees, with power to sell the same, whenever the said Hugh Campbell should recover a judgment against the said securities, or either of them, on any portion or all of said debt, and from the proceeds to pay such judgment and all costs. The property remained in that condition until the 17th of March 1842, when the said Robert B. executed another deed, whereby he conveyed to James Semple other slaves, a house and lot near Greensboro', his horses, mules, farming utensils, &c., together with the crop that might be raised on the plantation during the year 1842, with all his stock of cattle and hogs, upon trust to secure the debt due to Hugh Campbell; but if the proceeds of the property when sold should not be sufficient to pay said debt, then the trustee was directed to pay the residue out of the crop, to be raised that year, and out of the same crop to pay to the complainants a bill for two thousand dollars, which is the same bill described in the pleadings, and which, the deed recites, was accepted by Maulden, Montague & Co. on the faith of the crop of cotton, to be raised that year by the grantor, and also to pay the same firm nineteen hundred or two thousand dollars, due by account to them by the said Robert B., and, after having discharged said debts, then to pay certain other specified creditors in the order named in the deed. The defendants insist that they were prefered creditors, not only in regard to the property conveyed by the two deeds. but if that should prove insufficient to pay the entire debt to Hugh Campbell,

then the residue of his debt was to be first paid from the crop raised in the year 1842 ; and the complainants contend that their debts were to be first paid out of the cotton crop raised that year, whether the other property was sufficient to pay the entire debt to Hugh Campbell or not.

It is manifestly clear that all the property conveyed by the deeds, except the crop of cotton to be raised in the year 1842, was appropriated by the deeds, in the first instance, to the payment of the debt due to Campbell, and no other creditor could claim to participate in the trust funds arising from the sale of this property, until his debt was extinguished. But in reference to the crop of cotton to be raised that year, the deed contemplates that it shall be applied, not only to the extinguishment of the residue of the debt that might remain due to Campbell, but also to the payment of the debts due to the complainant. But which debt shall have priority in payment from the crop, we cannot ascertain from the deed. It is clear, we think, that the grantor supposed that, with the property conveyed and the cotton to be raised, the debts due to Campbell and to the complainants would be entirely paid. This may have been the reason why he did not declare which debt, as between Campbell and the complainants, should be first paid. But he has not declared a preference, nor directed which of these creditors should be first paid from the proceeds of the cotton, and this fund has proved insufficient to pay both. Under such circumstances, a court of equity can only make a *pro rata* distribution of the fund ; it certainly will not *create* a preference, for equality is equity. If a preference is created by a debtor in favor of a particular creditor, it must be allowed and enforced, but then the party, claiming such preference, must show from the instrument creating the trust that such preference was intended. If that be not shown, the court can only act on its own principles of equity, and make an equal distribution of the funds amongst all the creditors secured thereby. This is the principle that must govern in the distribution of the proceeds of the cotton between Campbell and the complainants, for we do not see that Robert B. Armistead, by his deed of the 17th of March 1842, created a preference between them, as to the crop of cotton, and consequently we can allow none. We come then to the conclusion that the complainants do take an interest under the deed,

which is, that the crop of cotton, raised in the year 1842, should be applied *pro rata* between their debt and the residue of the debt that may remain due to Campbell, after applying all the other property, conveyed by the two deeds, to its payment.

3. The last question to be examined is whether the injunction should have been retained until the final hearing. The judgment at law is for the proceeds of the cotton, raised on the plantation of Robert B. Armistead, in the year 1842. The cotton was shipped to the complainants by the trustee, James Semple, and after it was sold, the complainants refused to pay over the money, but claimed the right to retain it in satisfaction of debts due them. It is alleged in the bill that other property conveyed by the two deeds has been sold and the money applied to the debt of Campbell, which the complainants charge to be paid and satisfied. The answer admits that the other property has been sold and the money applied to Campbell's debt, but states that there yet remains due about five thousand dollars. As the cotton was to be applied to the payment of the debts due to the complainants and to the residue of the debt due to Hugh Campbell, *pro rata,* if the other property was insufficient to satisfy them in full, it is clear that the injunction was properly granted in the first instance; for if the entire debt of Campbell was paid as the bill alleges, then the complainants would be entitled to the whole of the cotton, for their debts amount to more than the proceeds of the cotton, and a court of equity will restrain the execution of a judgment at law, when the defendant would be entitled, upon paying it, to file his bill against the plaintiff and recover of him the same money. But the answer denies that the debt to Campbell is paid in full, and states that there is still due to him about five thousand dollars. When an injunction has been properly granted, it should not be dissolved unless the answer clearly and explicitly denies the equity of the bill.—See Rembert & Hale v. Brown, 17 Ala. 667, and cases there cited. If the answer shows that the complainant is entitled to some equitable relief, but not to the extent claimed by the bill, the injunction may be dissolved in part, or continued upon such terms as will ensure the ultimate ends of justice between the parties. So, if it appear that a part of a judgment at law only should be enjoined, the injunction may be perpetuated as to such part, and dissolved as to the residue.—Lyes v. Hat-

ton, 6 Gill & J. 122; Bell v. Cunningham, 1 Sumner, 89. Now if the answer had clearly and explicitly shown the precise amount which the plaintiffs at law were entitled to collect upon the judgment, the chancellor might have required the complainants to pay this amount into court, as a condition upon which the injunction would be retained, or he might have dissolved the injunction in part, and continued it as to the residue. But to dissolve an injunction as to part of a judgment at law, or to require the complainants to pay a portion of the judgment into court, as a condition for continuing the injunction until the hearing, the answer ought to show explicitly the amount which the plaintiff at law is in equity entitled to receive. If this be not done, and there is no danger of the debt being lost by continuing the injunction, it ought not to be dissolved until the final hearing. We cannot ascertain from the answer in this case how much the respondents will be entitled to recover of the complainants upon a final settlement of the accounts and the execution of the trust, for it is uncertain how much of the debt due to Hugh Campbell is still unpaid. We, therefore, think that the chancellor erred in dissolving the injunction. His decree must be reversed and the injunction here reinstated. Hereafter, when it shall appear how much is due to Campbell, and how much the complainants are entitled to retain in their own hands, the chancellor may make such order or decree, even before the final hearing, as will protect the rights of all the parties in interest.

Let the decree dissolving the injunction be reversed, and the injunction here reinstated.